## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

MARILYN ATKINS,          )
                                        )
      Plaintiff,          )
  vs.                             )
                                        )        7:16-cv-00567-LSC
GREENE COUNTY      )
HOSPITAL BOARD, and  )
ELMORE PATTERSON,   )
                                        )
      Defendants.      )

### MEMORANDUM OF OPINION

Before the Court is Defendants' Greene County Hospital Board ("GCHB") and Elmore Patterson's ("Mr. Patterson") (collectively, "Defendants"), Rule 56 motion for summary judgment as to all claims asserted in Plaintiff's Complaint. (Doc. 51.) The motion has been fully briefed and is now ripe for decision. Upon consideration of the motions, briefs, and evidentiary submissions, Defendants' motion is due to be GRANTED.

## I.    BACKGROUND[1]

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits

Greene County Hospital Board operates a hospital, physician clinic, and residential care facility in Eutaw, AL. Elmore Patterson is the Chief Executive Officer of GCHB. Marilyn Atkins ("Plaintiff" or "Atkins") began working as a GCHB registration clerk in early July 2011. When she began her employment, Atkins was provided with an Employee Handbook which notified employees that unauthorized absence from work is grounds for disciplinary action, up to and including termination. (Doc. 53-1 at 134.) In December 2013, GCHB implemented an attendance and disciplinary action policy providing that a "No-call, No-show equals termination." (Doc. 53-2 at 5-6.) Atkins asserts that the revised policy was not distributed to any GCHB employee who received the older version of the Employee Handbook, including herself. The version of the Handbook she received provided that the "no call/no show" penalty was a three day suspension, and a "2nd no show no call [would] result in termination." (Doc. 53-1 at 134; Atkins Dep. at 113; 226.)

In early September 2, 2011, Atkins enrolled in the Employees' Retirement System of Alabama ("ERS"), which is a defined benefit pension retirement plan through the Retirement Systems of Alabama ("RSA"). (*See* Doc. 53-1 at 150.)

---

specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . .") (internal quotes omitted).

Participation in the ERS defined benefit plan[2] is mandatory for all non-temporary, full-time GCHB employees. Once enrolled, employees are required to continue participation in the ERS plan until their employment is terminated. (Patterson Dec. ¶ 5.) Vested members of the RSA pension plan are eligible to receive a monthly retirement benefit from RSA upon reaching retirement age. Individuals must participate in the plan for at least ten years to be vested. Atkins was not vested at the time of her termination as she participated in the plan for less than ten years.

Before being paid to the RSA, retirement contributions deducted from employees' paychecks each month were put into a general fund from which general expenses were paid, instead of going into a separate payroll account. These contributions generally totaled $23,000 to $30,000 per month. JoAnne Cameron, Greene County Hospital Board office manager, testified that ERS deductions paid to the RSA are due "somewhere around" the tenth of the following month, and that they were almost never made within that time period by GCHB. (Cameron Dep. at 31.) Some payments[3] were delayed as many as three months.[4] (Atkins Dep.

---

[2] A defined benefit plan for ERISA purposes "consists of a general pool of assets, rather than individualized dedicated accounts. Such a plan, 'as its name implies, is one where the employee, upon retirement, is entitled to a fixed periodic payment.'" *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 423, 439 (1999) (citing *Commissioner v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 154, (1993).

[3] "On more than one occasion, Greene County Hospital remitted delinquent contribution to ERS. Because the ERS retirement plan established pursuant to 36-27-1, *et. seq.* is a defined benefit plan, the delay in contributions had no negative consequences to any Greene County Hospital

at 93-96.) Despite the tardy payments, the overall actuarial record valuation of the RSA shows that the pension plan for GCHB employees has been consistently 100% overfunded since at least 2010. (Doc. 53-1 at 169-171.) However, while in the general pool, funds were used by GCHB to pay various expenses. Employees complained about the late RSA payments and Mrs. Atkins brought the late payments to the attention of the Tiffany Grisby, who is the CFO, in addition to Mr. Inyang. On October 20, 2015, Atkins attended a board meeting to discuss her concerns surrounding the late RSA payments. At the meeting the board instructed Atkins to gather documentation and return with it for the next Board meeting. After Atkins addressed the Board, it was rumored that Patterson was looking for a reason to terminate her. Atkins again expressed concern to the Board at the November 2015 meeting and then again in early 2016.

In August of 2014, Atkins was assigned as a logistics clerk under the supervision of Etebom Inyang ("Inyang"). On a 2015 performance evaluation, she received an overall rating of "average" with a "below average" rating for

---

participant. No Greene County Hospital employee had any financial loss due to the delay."(Kelley Affidavit, Doc. 54-4 at 2-3.)

[4] For example, "in 2014, the October payment was not posted until December 2. The December payment was not posted until February 3. The February payment was not posted until April 14. The March payment was not posted until May 8. The April payment was not posted until June 3. The July payment was not posted until September 15. The August payment was not posted until October 6. Late payments were also made in 2012 and 2015." (Doc. 54-1 at 2; *see* Doc. 53-4 at 18-20; *see also* Doc. 53-1 at 166-68.) In 2012 one payment was late, and ten of the twelve payments made in 2015 were delinquent. (*Id.* at 168.)

dependability. (Doc. 53-1 at 40-41.) Over the course of her employment, Atkins was given a number of disciplinary warnings on account of her tardiness. In August of 2015, she was suspended for one day for being late on four occasions during one pay period, and suspended for two days for being argumentative with a supervisor. (Doc. 53-1 at 141-45.) Atkins would document her absences before each pay period ended. If she wanted to take off of work, Atkins was required to obtain approval from Inyang by sending time off requests to him via Microsoft Outlook calendar invitations. Inyang would deny or approve the requests by either accepting or declining the invitation. On October 21, 2015, Atkins sent an Outlook invitation to Inyang making a request to be off of work on October 26, 2015. Atkins did not report to work October 26, 2015, and returned to work the following day on the 27th.[5] On October 29, 2015, two days after returning, Atkins was terminated.

On December 16, 2015 Atkins submitted a request for a "lump sum payment" the "full distribution of [her] account." (Doc. 63-1 at 152.) The RSA mailed Atkins' refund check accounting for the entire amount of her retirement contributions plus accrued interest. Upon receipt, Atkins cashed the check. (Atkins Dep. 78-80.)

---

[5] While Atkins insists Mr. Inyang verbally approved her request on October 23, 2015, and knew Atkins would be out of the office because he directed Ms. Murray to telephone Atkins to inquire about a purchasing question, Inyang contends he never approved Atkins' request.

## II.   STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact[6] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence, but determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for

---

[6] A material fact is one that "might affect the outcome of the case." *Urquilla-Diaz v. Kaplan Univ.*, 780 F. 3d 1039, 1049 (11th Cir. 2015).

summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

### III. DISCUSSION

#### A. Plaintiff's Breach of Fiduciary Duty Claim

##### 1) Removal

Plaintiff requests reconsideration of the Court's previous ruling on the motion to remand, (doc. 8), "because the employee retirement benefits received through Retirement Systems of Alabama ("RSA") are exempt from the Employee

Retirement Income Security Act of 1974 ("ERISA")." (Doc. 54-1 at 7.) The Court upholds its previous ruling. This case was properly removed for the reasons set forth in its July 27, 2016 Memorandum of Opinion. (Doc. 12.)

Atkins was given leave to file an amended complaint restating her claims under ERISA and to state her non-ERISA claims separately. On August 17, 2016, she did so, asserting an ERISA breach of fiduciary duty claim, and adding a new ERISA "whistle-blower" retaliation claim based on her termination. (Doc. 23 at 10-11.) Atkins insists her case is due to be remanded because she abandoned any reliance on the group insurance plans in her second amended complaint which was filed post-removal, and is now solely basing her breach of fiduciary duty claim only on the RSA plan, a non-ERISA plan. However, at the time of removal, Atkin's complaint asserted claims covered by ERISA which were subject to complete preemption. In cases removed from state to federal court, "the district court must look at the case at the time of removal to determine whether it has subject-matter jurisdiction." *Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241, 1243 n. 2 (11th Cir. 2007) (per curiam) (citing *Poore v. American-Amicable Life Ins. Co. of Texas*, 218 F.3d 1287 (11th Cir. 2000));[7] *see also Behlen v. Merrill Lynch, Phoenix Inv. Partners,*

---

[7] The Eleventh Circuit's holding in *Poore* was subsequently overruled on other grounds in *Alvarez v. Uniroyal Tire Co.*, 508 F.3d 639, 641 (11th Cir. 2007) (citing *Powerex Corp. v. Reliant Energy Services, Inc.*, 551 U.S. 224 (2007)).

*Ltd.*, 311 F.3d 1087 (11th Cir. 2002) (holding that the district court must determine whether a federal question exists at time of removal using original complaint). As such, this Court properly maintained jurisdiction over the case and presently continues to have jurisdiction.

Even if Plaintiff's subsequent abandonment of reliance on the prior insurance contract for her breach of fiduciary duty claim could oust the Court of jurisdiction, her addition of the whistleblower retaliation claim is covered by ERISA. Consequently, the Court has jurisdiction over the action. *See* Doc. 23 at 10 ("[Atkins] was terminated as a result of those complaints and in direct retaliation for attempting to exhaust her administrative remedies as provided by ERISA."); *see also Cotton v. Mass. Life Ins. Co.*, 402 F.3d 1267, 1280 (11th Cir. 2005) ("[B]ecause the post-removal amended complaint asserted claims under ERISA, we have jurisdiction even if removal was initially improper.") (citing *Pegram v. Herdrich*, 530 U.S. 211, 215 n. 2 (2000)).

### 2) Standing

The Court must first evaluate whether Atkins has standing under ERISA to sue as a participant in the RSA plan. Plaintiff asserts she has standing to sue on behalf of the Plan because she was a participant in the RSA plan at the time of the misconduct and also because the Plan is "entitled to injunctive relief to ensure

Defendants remit payments on time every month and do not continue the same behavior." (Doc. 54-1 at 13.) Though Atkins maintains the RSA/ERS is not covered by ERISA, in her response brief, Atkins argues "assuming *arguendo*" that if the plan does fall within the auspices of ERISA, she possesses standing to sue for breach of fiduciary duty. The Court, therefore, will address this assertion of standing. In her deposition, Atkins testified that in January 2016, months before this action was commenced, she fully withdrew from the RSA plan and all her contributions were refunded. (Doc. 53-1 at 78-80.) The question for the Court thus becomes whether Atkins can be categorized as a "participant" in the RSA plan for the purposes of standing even though she has withdrawn from the plan at issue and has received all payment she was due in full.

Pursuant to 29 U.S.C. § 1132(a)(2), only "a participant, beneficiary, or fiduciary" of a plan may sue for "appropriate relief under 29 U.S.C. § 1109,"which imposes liability for breaches of fiduciary duty. *See also Cagle v. Bruner*, 112 F.3d 1510, 1514 (11th Cir. 1997). Consequently, standing to sue under ERISA for breach of fiduciary duty is restricted. As the Supreme Court made clear in a recent opinion, "ERISA sets forth those parties who may bring civil actions under ERISA and specifies the types of actions each of those parties may pursue. Thus, civil actions under ERISA are limited only to those parties and actions Congress

specifically enumerated." *WestRock RKT Company v. Pace Industry Union-Management Pension Fund*, 856 F.3d 1320 (2017) (internal quotations omitted) (citing *Gulf Life Ins. Co. v. Arnold*, 809 F.2d 1520, 1524 (1987) (*Gulf Life* denotes Section 1132 as a "standing provision" which "must be construed narrowly")).

Under ERISA,

> (7) The term "participant" means any employee or former employee of an employer, or any member or former member of an employee organization, **who is or may become eligible to receive a benefit of any type from an employee benefit plan** which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

28 U.S.C. § 1002 (7) (emphasis added).

In *Nugent v. Jesuit High School*, the Fifth Circuit found that the definition of "participant" under ERISA could not be read to include a former, non-vested employee. 625 F.2d 1285, 1288 (5th Cir. 1980);[8] *see also Jackson v. Sears, Roebuck and Co.*, 648 F.2d 225, 228-29 (5th Cir. 1981) (agreeing with *Nugent*). In *Firestone Tire and Rubber Co. v. Bruch*, the Supreme Court explained that, "[a] former employee who has neither a reasonable expectation of returning to covered employment nor a colorable claim to vested benefits . . . simply does not fit within the [phrase] 'may become eligible.'" 489 U.S. 101, 118 (1989) (quoting *Saladino v.*

---

[8] *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc ), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

*I.L.G.W.U. Nat'l Retirement Fund*, 754 F.2d 473, 476 (2nd Cir. 1985)). It is undisputed that Atkins is a former employee and was not vested at the time of her termination. As such, she cannot qualify as a participant under ERISA and thus lacks standing to pursue a claim for breach of fiduciary duty.

Standing under Article III is also lacking. Standing must exist when the action commences. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167 (2000). Because Atkins was no longer eligible for the benefits under the RSA plan when her complaint was filed, Atkins did not then possess standing under Article III.

Atkins likewise lacks standing to seek declaratory and injunctive relief. The Eleventh Circuit has explained that, "[a] plaintiff has standing to seek declaratory or injunctive relief only when he 'allege[s] facts from which it appears there is a substantial likelihood that he will suffer injury in the future.'"[9] *Bowen v. First Family Fin. Serv., Inc.*, 233 F.3d 1331, 1340 (11th Cir. 2000) (citing *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1346-47 (11th Cir. 1999)). Due to the fact that Atkins has withdrawn from the RSA plan and has received her benefits in full, she is not at risk for harm in the future. Thus, she cannot pursue her breach of fiduciary duty claim under 29 U.S.C. § 1132.

---

[9] "Ms. Atkins has not been penalized in any way due to any delays in her employer's remittance of her retirement contributions to ERS." (Kelley Dec., Doc. 53-4 at 2.)

### 3) Breach of Fiduciary Duty Claim

Even assuming *arguendo* that Atkins possesses the requisite standing to pursue her claim (which the Court has already determined she does not *supra*) summary judgment is still due to be granted as to her breach of fiduciary duty claim. In her deposition, Atkins stipulated that her breach of fiduciary duty claim is based only on the RSA plan. (Atkins Dep. at 92.) Atkins' main qualm with GCHB's actions regarding the RSA payments is their tardiness. GCHB asserts that as a rural hospital, it often has difficulties with cash flow and consequently cannot always remit "various payments promptly." (Doc. 52 at 3.) It is undisputed that payments were made by GCHB to the RSA. Thus, the question becomes whether the fact that payments were late and used to pay for GCHB's general bills in the meantime, constituted an actionable breach of fiduciary duty.

The Supreme Court has held that, a participant in a defined benefit plan such as the RSA, has an interest in fixed payments only, not the assets of the pension fund. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439-41 (1999) (holding that former employer's change to plan did not implicate fiduciary duty under ERISA). The Third Circuit in applying *Hughes*, explained that "diminution in plan assets, without more, is insufficient to establish actual injury to any particular participant." *Perelman v. Perelman*, 793 F.3d 368, 374 (3rd Cir. 2015) (citing

*Hughes*, 525 U.S. at 439-41). In determining whether a participant in a defined benefit program qualifies as "injured," the Supreme Court has said that "[m]isconduct by the administrators of a defined benefit plan will not affect an individual's entitlement to a defined benefit unless it creates or enhances the risk of default by the entire plan" because such a plan "consists of a general pool of assets rather than individual dedicated accounts." *LaRue v. DeWolff*, 522 U.S. 248, 255 (2008). Consequently, this injury is simply too attenuated prior to default of the plan to maintain a breach of fiduciary duty claim. While there is no doubt that the RSA payments were not submitted in a timely fashion, the record shows that the plan has been consistently overfunded and is not at risk of default despite the lateness of the payments or any alleged misconduct by administrators.

Likewise, the Fifth Circuit recently noted, in observing the holdings of sister circuits that, "constitutional standing for defined-benefit plan participants requires imminent risk of default by the plan, such that the participant's benefits are adversely affected; in turn, those courts have held that fiduciary misconduct, standing alone without allegations of impact on individual benefits, is too removed to establish the requisite injury." *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 546 (5th Cir. 2016) (citing *David v. Alphin*, 704 F.3d 327, 338 (4th Cir. 2013); *Harley v. Minn. Mining & Mfg. Co.*, 284 F.3d 901, 906 (8th Cir. 2002), *Perelman v. Perelman*,

919 F.Supp.2d 512, 517–520 (E.D. Pa. Jan. 24, 2013), aff'd, 793 F.3d 368 (3rd Cir. 2015). All the cases cited by the *Lee* court were plans which remained overfunded after the allegedly fiduciary misconduct, as was the case here. Consequently, though not binding, they are all persuasive authority for this Court.[10]  In her complaint and response brief, Plaintiff presented evidence demonstrating fiduciary misconduct, however, "without more" such a showing is insufficient to survive a motion for summary judgment. *See id.*

Atkins testified that GCHB ultimately submitted all employee retirement contribution to the RSA, including contributions for her in particular which further undermines her claim. (Atkins Dep. at 93.) She has presented no evidence exhibiting that the RSA plan is at risk of default, let alone imminently so. On the contrary, the record shows that the RSA defined benefit plan has been continuously overfunded for the past five years and documentation denotes that the plan's assets exceed its liabilities as its most recent funded ratio is 117.3 percent. (*See* Doc. 53-1 at 169-171.) In sum, summary judgment is due to be rendered in favor of the Defendants on Atkins' breach of fiduciary duty claim both on account of her lack of standing, and as a matter of law.

### B. Whistleblower retaliation claim 29 U.S.C. § 1140.

---

[10] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.

Atkins asserts that her termination was in retaliation for her raising concerns about the RSA payments at the Greene County Hospital Board meeting; while Defendants insist that the reason for Atkins termination was her violation of the newly implemented "no call/no show" policy, which is grounds for automatic termination.

ERISA protects employees against retaliation for asserting claims to benefits under an ERISA plan. *See* 29 U.S.C. § 1140 (making it unlawful to "discharge" a "participant" in an ERISA plan for asserting a claim for benefits). Where, as in Atkins' case, a plaintiff attempts to establish her retaliation claim by proving intentional discrimination using circumstantial evidence, the Court applies *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework. *See Wolf v. Coca-Cola Co.*, 200 F.3d 1337 (2000). In order to establish a *prima facie* case for § 1140 retaliation Atkins must show, "(1) that [s]he is entitled to ERISA's protection, (2) was qualified for the position, and (3) was discharged under circumstances that give rise to an inference of discrimination." *Id.* at 1343 (citing *Gitlitz v. Compagnie Nationale Air France,* 129 F.3d 554, 559 (11th Cir. 1997)). If the plaintiff meets her initial burden of establishing a *prima facie* case, the burden then shifts to the defendant to "articulate some legitimate nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802.

Once the defendant proffers such a reason, the burden shifts back to the plaintiff who must then prove that the defendant's legitimate reason was a mere pretext for discrimination. *Id.* at 804.

### 1) Atkins' voicing her complaint at an open floor meeting was not protected conduct under ERISA.

Defendants insist that Atkins assertions are insufficient to support a claim of retaliation because an "internal complaint does not qualify as protected conduct under ERISA." (Doc. 52. at 2, 26.) This Court agrees. While there is no binding Eleventh Circuit case law on this issue, the Sixth Circuit has construed protections under ERISA's whistleblower provision as precluding "employees who oppose, report or complain about unlawful practices," and instead being confined only to those "who participate, testify or give information in inquiries, investigations, proceedings or hearings." *See Sexton v. Panel Processing, Inc.*, 754 F.3d 332, 336 (6th Cir. 2014), petition for certiorari denied, 135 S. Ct. 677 (2014). Unlike other federal whistleblower statutes, ERISA § 510 protects only persons who provide information in response to an "inquiry."[11] The protections afforded by the anti-retaliation provision in ERISA are far narrower than those provided by similar provisions in statutes such as Title VII of the Civil Rights Act of 1964.

---

[11] 29 U.S.C.A. § 1140 ("It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter . . . .").

Other circuits have come to similar conclusions. *See Edwards v. A.H. Cornell & Son*, 610 F.3d 217, 225–26 (3d Cir. 2010) (concluding that "unsolicited internal complaints are not protected" under "the anti-retaliation provision of Section 510 of ERISA, 29 U.S.C. § 1140," based on a plain reading of the provision's terms); *King v. Marriott Int'l, Inc.*, 337 F.3d 421, 428 (4th Cir. 2003) (concluding that "the most compelling interpretation of the statutory language" excludes workplace complaints and therefore ERISA's whistleblower provision covers only activities more formal than a written or oral complaint to a supervisor); *Nicolaou v. Horizon Media, Inc.*, 402 F.3d 325, 329 (2d Cir. 2005) (per curiam) (reasoning that § 1140 covers a complaint only if the employee made it in response to an "inquiry" or a "request for information"). As such, Atkins was not engaging in protected conduct under ERISA by raising the issue of the late payments at the board meeting because her complaint was not made in response to any inquiry, nor was it in a proceeding or given as official testimony. The first prong required for a *prima facie* showing of retaliation is not satisfied, however, the Court will nonetheless address the other prongs required to state a claim under Section 1140.

### 2) Atkins' was qualified for her position

Though Defendants do point to poor performance evaluations and disciplinary action taken against Atkins on account of her tardiness, they do not

expressly contest Atkins' qualifications for her position. As such, this prong is deemed satisfied.

### 3) Atkins has not shown she was discharged under circumstances that give rise to an inference of discrimination.

Atkins asserts that because she was fired the week after having voiced complaints at the board meeting. While "[t]he burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action . . . mere temporal proximity, without more, must be "'very close.'" *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361 (11th Cir. 2007) (per curiam) (three month lapse of time between employee's complaints and termination not very close temporal proximity) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001)); *see also Drago v. Jenne*, 453 F.3d 1301 (11th Cir. 2006) (three months too long of a gap between protected activity and adverse employment action). In *Farley v. Nationwide Mut. Ins. Co,* the Eleventh Circuit determined that a seven week timeframe between an employee's EEOC complaint and their termination was "sufficiently proximate to create a causal nexus for purposes of establishing a *prima facie* case" when his supervisor knew about the complaint. 197 F.3d 1322, 1337 (11th Cir. 1999). Here, Atkins was terminated just nine days after she allegedly confronted the Board. However, the record, including

Atkins' own testimony, shows that her supervisor, Mr. Inyang, was not present at the board meeting. (Atkins Dep. at 108; Inyang Dec. ¶ 9.) Atkins has presented no evidence, aside from her own testimony, of Inyang's knowledge of her lodging the complaint with the Board. Additionally, Inyang testified that at the time he terminated Atkins, he had no knowledge of any such complaints.

To show a causal nexus required by *Farley*, 'a plaintiff need only show 'that the protected activity and the adverse action were not wholly unrelated.'" *Clover v. Total Sys. Servs., Inc.,* 176 F.3d 1346, 1354 (11th Cir. 1999) (quoting *Simmons v. Camden County Bd. of Educ.,* 757 F.2d 1187, 1189 (11th Cir.1985)). To succeed in establishing that the two are not entirely unconnected, "a plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Brungard v. BellSouth Telecommunications, Inc.*, 231 F.3d 781, 799 (2000). Mr. Inyang, Atkins' supervisor testified that he is the only one who made the decision to terminate Atkins' employment, and did so based on her failure to report to work on October 26, 2015 despite that fact that he had not approved her request for time off that day. (Inyang Dec. ¶ 6.) Atkins testified in her deposition that Mr. Inyang was not present at the October 26th Board meeting at which she voiced her complaints. (Atkins Dep. at 108.) She has presented no evidence showing Mr. Inyang was aware of Atkins' conduct in complaining at the

meeting, and therefore has not proven retaliatory motive required for the third prong of her *prima facie* case—that she was terminated under circumstances giving rise to an inference of discrimination.

### 4) Defendants' legitimate reasons and pretext

Atkins insists that because "[a]t the time of her termination, [she] had not received a refund of her contributions, nor had she withdrawn from the RSA Plan . . . consequently, Defendants' reasons for terminating Ms. Atkins are pretextual." (Doc. 54-1 at 12.) The Court finds this argument unpersuasive.

Defendants have proffered a legitimate reason for terminating Atkins—the updated December 2013 GCHB "no-call/no-show" policy—which provides that the first time an employee does not call and subsequently does not show up for work is grounds for automatic termination. (Patterson Dec. ¶ 4.) *See Flowers v. Troup County, Ga., School Dist.*, 803 F.3d 1327, 1138 (11th Cir. 2015) ("Put frankly, employers are free to fire their employees for 'a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'")(citing *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984)). The burden is on Atkins to show that the Defendants' proffered reason is mere pretext. Atkins explains that she was unaware of the updated policy because it was not distributed, and that a "no call/no show" was

not grounds for termination under the terms of the handbook she received when she began working for Greene County Hospital. Atkins' ignorance of the updated policy is insufficient to show that her adverse employment action was on account of a discriminatory reason. It is undisputed that Atkins did not report to work on October 26, 2015 even though her time off request had not received approval via the Windows Outlook calendar system. However, even if the updated policy was inapplicable to Atkins on account of her not having received a copy, record evidence shows that she had already been suspended for a total of three days for other various violations which included excessive tardiness. Pursuant to the plain language of the version of the handbook Atkins had received, "Poor attendance and excessive tardiness are disruptive. Either may lead to disciplinary action, up to and including termination of employment." (Doc. 53-1 at 134.) Atkins was aware that perpetual tardiness and failure to report to work could result in termination, as such, even under the handbook policy instead of the updated "no call/no show" policy, Atkins' has not provided evidence sufficient to show how Defendants' proffered reason for her termination was mere pretext as required by *McDonnell Douglas*. 411 U.S. at 804. As such, summary judgment is due to be granted on Atkins' retaliation claim.

## IV.  CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (doc. 51) is due to be GRANTED as to all claims. An Order consistent with this Memorandum of Opinion will be entered herewith.

**DONE** and **ORDERED** on December 14, 2017.

L. Scott Coogler
United States District Judge

190685